# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Berks-Lehigh Regional Police     :
Officers Association     :
    :
            v.           :    No. 1407 C.D. 2017
    :    Argued: September 14, 2018
Upper Macungie Township, Topton     :
Borough, Lyons Borough, and     :
Maxatawny Township     :
    :
    :
Appeal of: Upper Macungie Township    :


**BEFORE:   HONORABLE P. KEVIN BROBSON, Judge**
**HONORABLE ANNE E. COVEY, Judge**
**HONORABLE DAN PELLEGRINI, Senior Judge (P.)**


*OPINION NOT REPORTED*


**MEMORANDUM OPINION**
**BY JUDGE BROBSON**           **FILED: October 17, 2018**


        Appellant Upper Macungie Township (Upper Macungie) appeals from an order of the Court of Common Pleas of Berks County (trial court), dated August 31, 2017. Following a non-jury trial, the trial court entered a verdict in favor of Appellee Berks-Lehigh Regional Police Officers Association (Association) and against Upper Macungie in the amount of $564,084.07 and in favor of Appellees Topton Borough (Topton) and Maxatawny Township (Maxatawny) and against Upper Macungie for attorneys' fees incurred by Topton and Maxatawny in connection with the dissolution of the Berks-Lehigh Regional Police Commission (Commission). For the reasons set forth below, we reverse.

# I. BACKGROUND

We previously summarized the undisputed background facts of this case in our unreported decision of *Berks-Lehigh Regional Police Officers Association v. Upper Macungie Township* (Pa. Cmwlth., No. 786 C.D. 2016, filed Jan. 12, 2017) (*Berks-Lehigh I*):[1]

> On January 1, 1991, [Maxatawny], [Topton], and Lyons Borough [(Lyons)] (collectively, Participants) established the [Commission[2]] for the stated purpose of increasing the quality and efficiency of police protection for the Participants. The effect of the Commission was to establish a unified policing district, the Northeastern Berks Regional Police District, which allowed the Participants' formerly separate police departments to operate across any of the Participants' municipal boundaries.
>
> On December 26, 2000, the Participants agreed to amend the Commission's charter [(Commission's Charter)] to include [Upper Macungie] as an additional participant . . . .[3] On December 3, 2007, the Commission entered into a collective bargaining agreement (CBA) with the [Association], a duly recognized bargaining unit for fulltime police officers in the Berks-Lehigh Regional Police Department (the Department). The CBA covered the years 2008, 2009, and 2010. On January 24, 2011, the Commission and the Association participated in an interest arbitration pursuant to what is commonly referred to as the Policemen and Firemen Collective Bargaining Act or Act 111, Act of June 24, 1968, P.L. 237, *as amended*,

---

[1] Pursuant to Section 414(a) of the Commonwealth Court Internal Operating Procedures, "[a]n unreported opinion of this [C]ourt may be cited and relied upon when it is relevant under the doctrine of law of the case, res judicata or collateral estoppel."

[2] At the time of its establishment, the Commission was named the "Northeastern Berks Regional Police Commission."

[3] Participants renamed the Commission to "Berks-Lehigh Regional Police Commission" at the same time that they amended the charter to include Upper Macungie as an additional participant. All further references to the term Participants in this opinion shall include Upper Macungie.

43 P.S. §§ 217.1-.10. As a result of the January 24, 2011 arbitration, the arbitrators issued an award, providing that the Commission and the Association shall enter into a new agreement, which shall be effective retroactively from January 1, 2011, until December 31, 2013.

On March 19, 2012, the Commission held an executive session at which [Upper Macungie] moved to withdraw from the Commission effective at the end of 2012. On April 17, 2012, the Commission voted to close the Department effective December 31, 2012. As of December 31, 2012, the Commission disbanded the Department and terminated the employment of all Department police officers.

On May 16, 2012, the Association filed a charge with the Pennsylvania Labor Relations Board (PLRB) pursuant to Act 111 and the Pennsylvania Labor Relations Act (PLRA), [Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. §§ 211.1-.13,] alleging that the Commission engaged in unfair labor practices by failing to engage in collective bargaining or interest arbitration over the impact of [Upper Macungie's] withdrawal from the Commission and the subsequent closure of the Department. By decision dated June 7, 2012, the PLRB declined to issue a complaint and dismissed the charge of unfair labor practices after determining that the charge was filed prematurely.

On May 20, 2013, the Association and the Commission participated in an arbitration before a panel of three arbitrators to determine the impact of the Commission's decision to disband the Department. On April 26, 2014, the panel issued an award titled "Act 111 Impact Arbitration Award" (the Award). The Award purported to be pursuant to Section 4(b) of Act 111, 43 P.S. § 217.4(b). The panel framed the issue before it as "what is the impact of the Commission's decision to no longer provide police services by disbanding its police department[,] how the impact of that decision shall be addressed and what remedies, if any shall be provided."

The Award addressed numerous issues relating to the dissolution of the Department, including: (1) reference

3

letter[s] to be given to officers employed as of the date of dissolution, (2) ongoing maintenance of personnel files, (3) cooperation on ongoing arrests and active criminal cases, and (4) recall of officers in the event that the Department is re-established on or before December 31, 2014. Notably, the Award provided that "[a]ll other proposals of the parties regarding the impact of the Commission's decision to disband its police department which are not addressed in this Award have been fully considered by the Panel and rejected by a majority of the same." The Award also provided that "[t]he Panel shall retain jurisdiction for ninety (90) days from the date of this Award for the limited purpose of addressing any issues involving the implementation of the terms of the within Award."

On November 7, 2014, the Association filed a complaint in the trial court against the Participants, alleging that the CBA was a valid contract between the Participants and the Association and that the Participants breached that contract by disbanding the Department prior to the expiration of the CBA on December 31, 2013. On December 15, 2015, [Upper Macungie] filed a motion for summary judgment in the trial court, arguing that the Association raised [its] breach of contract claim . . . before the May 23, 2013 arbitration panel and that the Association's complaint should be dismissed because the Award resolved all of the claims therein. The trial court denied [Upper Macungie's] motion for summary judgment without opinion on March 16, 2016.

On April 12, 2016, [Upper Macungie] petitioned the trial court to amend its March 16, 2016 order to include the interlocutory appeal language prescribed by 42 Pa. C.S. § 702(b). By order dated April 14, 2016, the trial court denied [Upper Macungie's] request to include the interlocutory appeal language. On May 16, 2016, [Upper Macungie] petitioned this Court for review of the trial court's denial of [Upper Macungie's] request to include the interlocutory appeal language. On June 14, 2016, we granted [Upper Macungie's] petition for review to consider whether the trial court lacked jurisdiction over this matter because the matter was either controlled by

4

arbitration or was within the exclusive jurisdiction of the PLRB.

*Berks-Lehigh I*, slip op. at 1-5 (footnotes and citations omitted).

By opinion and order dated January 12, 2017, this Court concluded: (1) the Award was an interest award and not a grievance award, and, therefore, the Award was not final and binding with respect to the Association's breach of contract claim; and (2) the trial court has jurisdiction to consider the Association's breach of contract claim because the Association's breach of contract claim does not allege any unfair labor practices and the CBA does not set forth a grievance process. As a result, this Court affirmed the trial court's order denying Upper Macungie's motion for summary judgment.

The trial court held a non-jury trial on July 31, 2017. At that time, the Association presented the testimony of William Easparro (Easparro), President of the Association. (Reproduced Record (R.R.) at 89a.) Easparro testified that he worked for the Department as a sergeant from 2002 through December 31, 2012. (*Id.* at 84a-85a.) Easparro explained that, on December 31, 2012, the Department involuntarily terminated his employment and shut down. (*Id.* at 85a-86a.) On that same date, Easparro began working for the Upper Macungie Police Department, also as a sergeant. (*Id.* at 84a-85a.) The Department continued to provide police services to Maxatawny, Topton, Lyons, and, if necessary, Upper Macungie until 11:59 p.m. on December 31, 2012. (*Id.* at 117a, 119a.) The Upper Macungie Police Department went into service at 6 p.m. on December 31, 2012. (*Id.* at 118a.) As a sergeant for the Department, Easparro provided police services to Upper Macungie, including crime investigation, enforcement of traffic laws, and street patrols. (*Id.* at 85a, 115a-16a.) Easparro continued to provide those same police services to Upper Macungie as a sergeant for the Upper Macungie Police Department. (*Id.* at 85a,

5

115a-16a.) The only things about Easparro's job that changed on December 31, 2012, were his uniform patch, his police vehicle, and his salary and benefits package. (*Id.* at 85a, 120a.) Easparro explained that at no time did he or the other Department police officers who Upper Macungie hired ever stop providing police services to Upper Macungie. (*Id.* at 116a-17a.) Easparro indicated that Upper Macungie received a benefit from hiring Department police officers because such police officers knew the radio system, the mobile data from the cars' terminals, Upper Macungie's roadways, Lehigh County's court system, and everything else about the jurisdiction, and, therefore, Upper Macungie did not need to train them. (*Id.* at 120a-21a.)

Easparro testified further that he first learned that his employment with the Department could be impacted in August 2011, when Upper Macungie gave the Commission an ultimatum—*i.e.*, Upper Macungie would withdraw from the Commission if it did not receive more voting power. (*Id.* at 92a-93a, 148a.) Easparro explained that, some months later in early 2012, despite the fact that the Department was already providing Upper Macungie's police services, Upper Macungie took steps to create its own police department and hired a chief of police, two lieutenants, and an office manager. (*Id.* at 93a-94a, 96a-98a.) Thereafter, at a March 2012 Commission meeting, Upper Macungie made a motion to withdraw from the Commission. (*Id.* at 95a.) Immediately thereafter, one of the other Participants made a motion to dissolve the Commission effective December 31, 2012. (*Id.*) Easparro explained that, despite representations by Upper Macungie's Commissioner, Sam Ashmar (Ashmar), in October 2011, that the Department police officers did not have to worry about their employment, Ashmar informed those police officers in attendance at the March 2012 Commission meeting

6

that they could submit their resumes to Upper Macungie for consideration of employment. (*Id.* at 95a-96a.)

Easparro also testified that Upper Macungie ultimately offered probationary employment to 21 Department police officers. (*Id.* at 96a, 100a-01a, 117a-18a.) Upper Macungie's offer of probationary employment identified the police officers' salaries and provided an explanation of benefits. (*Id.* at 100a-02a.) Easparro explained that there were numerous differences between the Department's compensation package, which was determined based on the terms of the CBA, and Upper Macungie's compensation package, which Upper Macungie had unilaterally imposed. (*Id.* at 104a.) Those differences included: (1) the annual salaries for patrolmen, detectives, and sergeants were reduced by $3,000 to $4,000; (2) the rank of corporal was eliminated, causing 3 Department police officers to lose their rank and suffer further losses in salary; (3) holiday pay was reduced from double-time to time-and-a-half; (4) personal time was reduced from 40 hours per year to 24 hours per year; (5) the $450 per year uniform allowance was eliminated, requiring the police officers to pay out-of-pocket for certain items such as court attire, rain gear, long johns, heavy weight gloves, and back-up weapons; (6) longevity pay was eliminated; (7) the amount and computation of court time was changed; (8) bereavement pay was reduced from a maximum of 40 hours per year to a maximum of 24 hours per year; and (9) the family medical insurance contribution increased from $910 per year to 12.5% of each police officer's salary. (*Id.* at 104a-105a, 107a-15a.)

Based on the differences in the compensation packages—*i.e.*, the benefits guaranteed under the terms of the CBA and the benefits that, as Easparro characterized, Upper Macungie had unilaterally imposed—Easparro calculated the

damages sustained by each of the 21 Department police officers hired by Upper Macungie. (*Id.* at 121a-23a, 131a.) Easparro also calculated the damages sustained by the 4 Department police officers who were not hired by Upper Macungie. (*Id.* at 123a-24a, 131a-34a.) Easparro testified that the damages sustained by the Association totaled $446,807.42. (*Id.* at 137a.) Easparro testified further that he added 6% interest per year for every year since 2013, for a total loss of $564,084.07. (*Id.*)

On cross-examination, Easparro admitted that there was nothing in the CBA that he could point to that gave Department police officers a guarantee of employment through December 31, 2013. (*Id.* at 140a.) Easparro explained, however, that "[t]here was no just cause or any wrongdoing" that would justify the termination of the police officers; rather, Upper Macungie "stated repeatedly that the [police] officers were doing a fantastic job." (*Id.* at 141a.) Easparro explained further that he also relied on Ashmar's statement that the police officers did not have to worry about their jobs. (*Id.* at 143a.) Easparro admitted that Upper Macungie did not ultimately withdraw from the Commission because the Participants unanimously voted to dissolve the Commission. (*Id.* at 148a, 168a.) Easparro indicated, however, that Upper Macungie's unilateral actions are what caused that vote to occur. (*Id.* at 148a-49a.) Easparro described the event as "a hostile takeover of the police department." (*Id.* at 159a.) While Easparro admitted that Participants did not sign the CBA, he believed that they were all joint employers with the Commission and parties to the CBA. (*Id.* at 162a.)

The Association also presented the testimony of Kathy Rader (Rader), a member of Upper Macungie's Board of Supervisors (UMBS), who also served as

8

UMBS's secretary at the time of the events that gave rise to this litigation.[4] (*Id.* at 169a.) Rader acknowledged that UMBS's meeting minutes from October 6, 2011, provided that "the members of the force need have no concern about their future. All the members are doing a great job. The main concern that needs to be worked out is the future of the [Commission]." (*Id.* at 171a.) Rader further acknowledged that UMBS's meeting minutes from November 3, 2011, provided that "Ashmar emphasized that this is nothing against any of the current [police] officers who are doing an excellent job." (*Id.* at 171a-72a.) Rader also acknowledged that UMBS's meeting minutes from March 1, 2012, through July 30, 2012, confirmed that Upper Macungie decided to create its own police department, adopted an ordinance establishing such police department, and hired individuals to staff such police department. (*Id.* at 172a-74a.)

Rader admitted that Upper Macungie was not satisfied with its voting rights in the Commission and that Upper Macungie began to form its own police department when the other Participants would not agree to amend the Commission's Charter to give Upper Macungie a 76% share of the voting rights. (*Id.* at 180a-81a.) Rader indicated that Upper Macungie no longer wanted to "get stuck paying" for 76% of something that the other Participants had agreed to purchase. (*Id.* at 190a.) While she acknowledged that Upper Macungie had agreed to each change to the Commission's formula regarding Upper Macungie's responsibility for the payment of Commission expenses, Rader indicated that Upper Macungie had reached the point where "enough [was] enough." (*Id.* at 190a.) Rader stated further that, prior to the Commission's vote to dissolve in April 2012, Upper Macungie had only started to formulate a plan for its own police department; nothing had been

---

[4] Rader testified for the Association as on cross-examination.

officially decided or voted on. (*Id.* at 183a.) Rader explained that there was still an opportunity for the Commission to remain intact if the other Participants agreed to change the voting rights. (*Id.* at 183a-84a.) Rader nevertheless admitted that, in April 2012, Upper Macungie had already taken steps to create an ordinance establishing the police force and to hire a police chief, two lieutenants, and a manager so that it could get "the police department up and running." (*Id.* at 185a-87a.) Rader indicated further that, before Upper Macungie had a chance to withdraw from the Commission, the Participants voted to dissolve. (*Id.* at 192a.)

Rader further admitted that it was beneficial to Upper Macungie that the Department's police officers knew the area, had investigated crime in Upper Macungie, had enforced Upper Macungie's traffic laws, knew the members of the community, and were already working as police officers in Upper Macungie. (*Id.* at 175a-76a.) Rader stated that Upper Macungie received over 70 other employment applications from individuals outside of the Department but chose to give preference to Department police officers because they were better qualified for Upper Macungie's needs. (*Id.* at 176a.) By doing so, Rader explained that Upper Macungie believed that it was helping Department police officers by giving them preference. (*Id.*) When asked whether Upper Macungie was doing Department police officers a favor by cutting their salaries, Rader indicated that Upper Macungie was in the process of starting a new police department with a brand new state-of-the-art building, new vehicles, and new uniforms. (*Id.*)

In opposition to the Association's case, Upper Macungie recalled Rader. Rader testified that, despite Upper Macungie's requests for a resolution, the Commission never took any official action with respect to Upper Macungie's intent to withdraw. (*Id.* at 215a.) At the Commission's April 17, 2012 meeting, one of

Maxatawny's commissioners made a motion to disband the Department and to dissolve the Commission. (*Id.* at 216a, 236a, 615a-16a.) All Participants voted unanimously in favor of the motion. (*Id.* at 216a, 235a, 616a.) Rader indicated that, had Upper Macungie withdrawn from the Commission, Upper Macungie would not have voted on the motion to dissolve or have been involved in the dissolution process. (*Id.* at 217a, 219a.)

Rader testified further that, while Upper Macungie gave Department police officers the opportunity to apply for a position with the Upper Macungie Police Department, it did not hire all of them. (*Id.* at 222a.) Rader also explained that the police officers hired by Upper Macungie received lower salaries and lesser benefits than they had from the Commission, because Upper Macungie had many expenses associated with the creation of its police department and had promised its residents that it would not raise taxes in connection therewith. (*Id.* at 223a-25a.) Rader believed that Upper Macungie was "doing right by" the police officers even though Upper Macungie was giving them lower salaries, because Upper Macungie was giving them a job and "[t]hey weren't standing in the unemployment line." (*Id.* at 226a.)

On cross-examination, Rader admitted that, at the August 4, 2011 UMBS meeting, Ashmar recommended that Upper Macungie leave the Commission if the other Participants objected to giving Upper Macungie 76% of the voting power in the Commission. (*Id.* at 231a.) At that same meeting, Ashmar also indicated that a potential solution to the situation was for Upper Macungie to create its own police force and contract out its police services to the other Participants. (*Id.* at 231a-32a.) Ultimately, Ashmar made a motion to work on an exit strategy from the Commission if the other Participants did not agree to amend the Commission's voting rights to be

11

consistent with the cost contributions. (*Id.* at 232a.) The motion passed by a 2-1 vote. (*Id.*) Rader admitted further that Upper Macungie agreed in writing "from the very beginning" to receive only a 25% vote in the Commission, and that, in order to get its voting rights changed, Upper Macungie informed the other Participants that they either agree to change the voting rights or Upper Macungie would withdraw from the Commission. (*Id.* at 238a.)

Topton presented the testimony of Michael Wagaman (Wagaman), a member of Topton's Borough Council. (*Id.* at 243a.) Wagaman testified that he and Topton's mayor represented Topton on the Commission. (*Id.*) Pursuant to the Commission's Charter, Topton, as well as each of the other Participants, had 1 vote, and Topton was responsible for 6.5% of the Commission's costs and expenses. (*Id.* at 244a.) Wagaman stated that Upper Macungie tried to obtain control of the Commission by making a proposal that the Commission's Charter be amended so that each Participant's voting rights were proportionate to its share of the responsibility for the Commission's costs and expenses. (*Id.* at 244a, 248a.) Wagaman stated further that Upper Macungie indicated that it was going to leave the Commission if the other Participants would not agree to the change to the Commission's Charter. (*Id.* at 245a, 248a.) Topton, Lyons, and Maxatawny never agreed to change the voting rights under the Commission's Charter. (*Id.* at 244a-45a.) Wagaman explained that Topton would not agree to change the voting rights because it would have lost its and "the community's voice" in the Commission and the Department. (*Id.* at 245a.) Wagaman believed that Lyons and Maxatawny were opposed to the change in voting rights for a similar reason. (*Id.*)

Wagaman testified further that no Topton officials initiated a discussion about the dissolution of the Commission or made a motion to dissolve the

Commission. (*Id.* at 245a-46a.) Wagaman explained, however, that without Upper Macungie's participation in the Commission, Topton could not afford to have its own police department; Topton, Maxatawny, and Lyons simply did not have a need for 25 police officers. (*Id.* at 248a.) Wagaman explained further that Topton agreed to the dissolution of the Commission rather than just letting Upper Macungie withdraw, because Topton could not afford to fund the Department without Upper Macungie's contribution. (*Id.* at 250a-51a.) Wagaman indicated that Topton would have continued with the Commission had Upper Macungie not sought to amend the voting rights or withdraw from the Commission. (*Id.* at 249a.) Wagaman also testified that as of December 31, 2012, Topton, Maxatawny, and Lyons no longer had a police department but that Upper Macungie did. (*Id.*)

In opposition to the Association's case, Maxatawny presented the testimony of Jill Nagy (Nagy), Maxatawny's solicitor. (*Id.* at 252a.) Nagy explained that she became involved with the Commission in 2011, when Upper Macungie indicated that it would withdraw from the Commission if the other Participants would not agree to change the voting rights. (*Id.* at 253a-54a.) At that time, Nagy began to attend Commission meetings. (*Id.* at 254a-55a.) Nagy indicated that Ashmar attended those meetings and made clear that, if Upper Macungie did not receive 76% of the voting rights, Upper Macungie would leave the Commission and take not only its 76% contribution but also all of the Commission's police officers and would "stick [all of the other Participant's] with a bill." (*Id.* at 255a, 275a-76a.) Nagy indicated further that Maxatawny, Topton, and Lyons attempted to express their concerns that they could not continue with the Commission if Upper Macungie withdrew and suggested that they at least continue until the end of the CBA's term. (*Id.* at 256a-57a.) Nagy explained, however, that

13

Ashmar did not keep an open mind and that "[t]he meetings were borderline being abusive to the other [Participants]." (*Id.* at 257a.)

Nagy also testified that, even though Maxatawny made the motion to dissolve the Commission, Maxatawny considers what happened with the Commission to be a hostile takeover/withdrawal by Upper Macungie, not a dissolution of the Commission. (*Id.* at 261a, 267a-69a, 272a, 274a, 276a-77a.) Nagy explained that, at the time that the Participants voted to dissolve the Commission, Upper Macungie made clear that it was leaving the Commission and even had everything already set up for its police department. (*Id.* at 261a.) Nagy agreed that Upper Macungie sought control of the Commission, and, when Maxatawny, Topton, and Lyons did not agree to give Upper Macungie control, Upper Macungie took control. (*Id.* at 277a-80a.) She stated that Maxatawny did not have the economic resources to continue with the Commission without Upper Macungie or to pursue legal action against Upper Macungie to prevent its withdrawal from the Commission. (*Id.* at 261a-62a.) She explained further that Maxatawny, Topton, and Lyons could not have simply let Upper Macungie withdraw and had no other option but to dissolve the Commission because they simply could not "put themselves in jeopardy like that." (*Id.* at 270a.) Nagy also testified that Maxatawny did not participate in the dissolution process because it did not agree with how the winding-up process was being handled; Maxatawny believed that Upper Macungie, as the withdrawing party, was solely responsible for all of the Commission's debts. (*Id.* at 271a-74a.)

Nagy indicated that Maxatawny also attributes this litigation and all of the Association's damages to Upper Macungie's withdrawal from the Commission. (*Id.* at 262a.) Nagy stated that Maxatawny incurred legal expenses in connection

14

with Upper Macungie's withdrawal and put Upper Macungie on notice that it would be seeking recovery of those fees. (*Id.* at 262a-66a.) Nagy explained that, as soon as Upper Macungie indicated that it was withdrawing from the Commission, she kept separate billing records for Commission-related matters because, pursuant to the Commission's Charter and an amendment to the Commission's Charter (Amendment to the Commission's Charter), Upper Macungie, as the withdrawing party, was responsible for Maxatawny's legal fees. (*Id.* at 254a, 263a.)

In rebuttal, Upper Macungie presented the testimony of Andrew Schantz (Schantz), Upper Macungie's solicitor. (*Id.* at 285a.) Schantz testified that, from his perspective, Upper Macungie made a motion to withdraw from the Commission, but the Commission never acted on it;[5] rather, the Participants voted unanimously in favor of Maxatawny's motion to dissolve the Commission. (*Id.* at 286a.) Schantz explained that, following the unanimous vote to dissolve the Commission, there was a winding-down process. (*Id.* at 287a-88a.) Schantz explained further that the process operated as a dissolution and that, if Upper Macungie had withdrawn from the Commission, it would not have participated in such process. (*Id.* at 288a.)

By order dated August 31, 2017, the trial court entered a verdict in favor of the Association and against Upper Macungie in the amount of $564,084.07 on the Association's breach of contract claim. The trial court also ruled on Maxatawny's cross-claim against Upper Macungie for damages, ordering Upper Macungie to reimburse Topton and Maxatawny for the attorneys' fees they incurred in connection

---

[5] While both Easparro and Schantz refer to a "motion" having been made by Upper Macungie to withdraw from the Commission, it appears from our review of the record that, at some time prior to the Commission's November 21, 2011 meeting, Upper Macungie notified the Commission of its intent to withdraw from the Commission effective December 31, 2012. (R.R. at 584a-86a.)

15

with the dissolution of the Commission. In so doing, the trial court concluded that Upper Macungie breached the terms of the CBA and was liable for damages under the Commission's Charter and the Amendment to the Commission's Charter. The trial court reasoned:

> The term of the CBA was [3] years and covered the calendar years of 2011, 2012, and 2013. Thus, the police officers had a duty to work for the Commission according to the terms of the CBA and the Commission had a duty to employ those officers at the rate and with the benefits outlined in the CBA through 2013.
>
> [Upper Macungie] argues that the law allows a business under a collective bargaining agreement to cease operations. That is a correct statement of the law in general, but it is inapplicable to the case *sub judice*. As [Nagy] testified, this dissolution was actually a "hostile takeover" accomplished by an inimical giant. [Upper Macungie] had no problems with the work of the police force. In fact, it even conveyed this message to the officers. It could afford its share of the expenditures. Since it joined the Commission in 2000, it knew that it would have to pay the largest share of the expenses due to its greater size in population and the costs associated with the increased coverage. All [4] municipalities continuously agreed that all the municipalities share the expenses according to their size. This was fair since there was no condition that limited the police to only [25%] of the time being spent in one municipality. In other words, the actual Regional Police activity in [Upper Macungie] was logically more commensurate to the [76%] that [Upper Macungie] contributed to the cost of the operation than to the [25%] of voting power that each municipality possessed.
>
> The [Upper Macungie] supervisors no longer liked the terms of the Charter regarding voting rights. They wanted to unilaterally change the voting procedure to allow them to make all the decisions of the Commission. In essence, [Upper Macungie] would be able to commandeer the [Department] and run it without any interference from their equal partners.

16

Moreover, [Upper Macungie] knew that the other [3] municipalities could not meet the greater expenses caused by its participation in the Commission; nor should they have been forced to undertake such an onerous burden of overstaffing [3] townships with [25] police officers. [Upper Macungie] had the other municipalities over the proverbial barrel. It ultimately forced the Commission to "dissolve" prematurely because the other members alone could not afford to meet the terms of the CBA. All [4] municipalities had contracted a [3-]year operations agreement. In year [2], [Upper Macungie] unilaterally refused to comply with the term of the CBA and then forced the other municipalities to breach the CBA. The officers would not have suffered any damages if [Upper Macungie] had waited another [12] months to withdraw at the end of calendar year 2013, the end of the CBA.

For these reasons, the disbandment of the [Department] was not due to a voluntary dissolution but to the withdrawal of [Upper Macungie], the biggest entity. It was also not a dissolution of operations because [Upper Macungie] hired the same police officers who had covered its municipality as officers in the [Department]. To achieve its own police department, [Upper Macungie] destroyed the Commission and, by doing so, breached the terms of the CBA. It hired experienced officers who knew the patrol territory, yet paid them a smaller salary with fewer benefits. [Upper Macungie's] police department is, in essence, that of the Commission; only the name of the department changed. . . .

. . . .

Pursuant to [Paragraph 8 of the Amendment to the Commission's Charter[6] and Paragraph 11 of the

_____

[6] Paragraph 8 of the Amendment to the Commission's Charter provides, in relevant part:

If any Participant, whether an original Participant or a Participant subsequently added to the [Commission], voluntarily withdraws from its membership in the [Commission] at any time during the operation of [the Charter], said withdrawing Participant, except as expressly set forth herein, shall forfeit all assessments and contributions up to and including the time of withdrawal, and shall in addition

17

Commission's Charter[7]], this [trial] court finds that [Upper Macungie] is solely responsible for the damages incurred by the police officers due to its voluntary withdrawal from the Commission. It disbanded the [Department] prematurely and it owes damages for the monies due under the final year of the CBA. [Upper Macungie] is also responsible for the legal fees of [Topton and Maxatawny] that were incurred by them to dissolve the Commission because they were solely due to [Upper Macungie's] withdrawal.

(Trial Ct. Op. at 7-9.) Upper Macungie filed a motion for post-trial relief, which the trial court denied by order dated September 26, 2017. This appeal followed.

## II. ISSUES ON APPEAL

On appeal,[8] Upper Macungie raises the following issues: (1) whether the trial court committed an error of law and abused its discretion by awarding

---

forfeit any interest on said sum and shall be further responsible for payment of all increased Workmen's [sic] Compensation premiums and other insurance premiums as well as all other benefits which the [Commission] would be obligated to pay to or on behalf of withdrawing Participant's employees calendar year in which the withdrawal or termination takes place.

(R.R. at 318a.)

[7] Paragraph 11 of the Commission's Charter provides:

A Participant may withdraw from participating in the [Commission] provided that written notice of intent to withdraw is sent by certified mail, return receipt requested, to the [Commission] at least one year in advance of November 1 of the year in which such withdrawal is to be effective. The immediate costs of such withdrawal and any continuing obligations and liabilities necessarily assumed by the remaining Participants of the [Commission] totally or partially attributable to the withdrawing Participant's participation, shall be satisfied by the withdrawing Participant upon the effective date of withdrawal. The withdrawal of less than two-thirds of the Participants at any given effective date shall not result in a termination or dissolution of the [Commission].

(R.R. at 310a.)

[8] "Our standard of review of a non-jury trial is to determine whether the findings of the trial court are supported by competent evidence, and whether an error of law was committed."

18

damages to the Association; (2) whether, assuming for purposes of argument that an award of damages to the Association is proper, the trial court committed an error of law and abused its discretion by awarding damages to the Association in the amount of $564,084.07; (3) whether the trial court committed an error of law and abused its discretion by holding Upper Macungie solely responsible for the damages incurred by the parties; (4) whether the trial court committed an error of law and abused its discretion by awarding attorneys' fees to Topton and Maxatawny; and (5) whether the trial court committed an error of law and abused its discretion by entering judgment against Upper Macungie because the Commission was a necessary party to this action.[9]

### III.  DISCUSSION

### A.  Whether the Association Should Have Been Awarded Damages

Upper Macungie argues that the trial court committed an error of law and abused its discretion by awarding damages to the Association because the CBA does not:  (1) guarantee continued employment to the police officers for the term of the CBA; or (2) prohibit the dissolution of the Commission.  In response, the Association appears to argue that Paragraph 1 of the CBA, entitled "Duration of Agreement," clearly establishes that the CBA was a 3-year contract, and, therefore,

---

*Swift v. Dep't of Transp.*, 937 A.2d 1162, 1167 n.5 (Pa. Cmwlth. 2007), *appeal denied*, 950 A.2d 270 (Pa. 2008).

[9] In the "Statement of Questions Involved" section of its brief, Upper Macungie suggests that the trial court also committed an error of law and abused its discretion by entering a verdict in favor of the Association because the impact arbitration and Award addressed all of the issues that were before the trial court.  Upper Macungie, however, has failed to develop any argument on this issue, and, therefore, we will not address it any further in this opinion.  *See* Pa. R.A.P. 2119(a); *Rapid Pallet v. Unemployment Comp. Bd. of Review*, 707 A.2d 636, 638 (Pa. Cmwlth. 1998).  We note, however, that this Court previously addressed this issue in *Berks-Lehigh I*, when we concluded that the Award was not final and binding with respect to the Association's breach of contract claim and that the trial court had jurisdiction to consider such claim.

19

the CBA guaranteed continued employment to the police officers through the CBA's 3-year term. In its reply brief, Upper Macungie argues that "the Association has not and cannot provide a legally supported argument or evidence that the CBA guaranteed continued [employment] or that the CBA was breached by [Upper Macungie]." More specifically, Upper Macungie argues that "the CBA's duration clause applied only so long as the Commission continued to employ the officers[,]" and "the Commission stopped providing police services effective December 31, 2012." (Upper Macungie's Reply Br. at 2-3.)

A collective bargaining agreement is not a contract of employment; rather, a collective bargaining agreement establishes the employment terms between an employer and its covered employees. *Amalgamated Ass'n of Street, Elec. Ry. and Motor Coach Emps. of Am., Div. 85 v. Pittsburgh Rys. Co.*, 142 A.2d 734, 736 (Pa.), *cert. denied*, 358 U.S. 882 (1958). As the Pennsylvania Supreme Court has explained:

> "Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason if [sic] it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what has often been called a trade agreement rather than a contract of employment."

*Id.* (quoting *J.I. Case Co. v. Nat'l Labor Relations Bd.*, 321 U.S. 332, 334-35 (1944)).

In this case, the Association has failed to cite any provision in the CBA, the Commission's Charter, or the Amendment to the Commission's Charter that establishes a contract of employment or a guarantee of continued employment to the

Department's police officers for the term of the CBA. The CBA's "Duration of Agreement" provision merely establishes the 3-year time period during which the terms and conditions set forth in the CBA will apply. It does not establish a 3-year employment term or a guarantee of continued employment to the Department's police officers through December 31, 2013. Thus, the disbandment of the Department and the resulting termination of the police officers' employment with the Department on December 31, 2012, does not constitute a breach of the CBA, and, therefore, the Association was not entitled to an award of damages. For these reasons, we conclude that the trial court committed an error of law and abused its discretion by awarding damages to the Association.[10]

### B. Whether Topton and Maxatawny Should Have Been Awarded Attorneys' Fees

Upper Macungie argues that the trial court committed an error of law and abused its discretion by awarding attorneys' fees to Topton and Maxatawny because "neither the [Commission's] Charter nor the Dissolution Agreement provided for the payment of attorneys' fees, and [Maxatawny's] cross-claim pleadings never included any allegation of or demand for attorneys' fees." (Upper Macungie's Br. at 34.) In response, Topton and Maxatawny argue that it was within the sound discretion of the trial court to award them the attorneys' fees that they incurred in connection with the dissolution of the Commission, because, pursuant to the terms of the Amendment to the Commission's Charter, Upper Macungie, as the withdrawing party, was responsible for the costs of such withdrawal and any continuing obligations and liabilities assumed by the remaining Participants.

---

[10] Because we have concluded that the trial court committed an error of law and abused its discretion by awarding damages to the Association, we need not consider whether the amount of damages awarded to the Association by the trial court was improper or whether Upper Macungie is solely responsible for the damages awarded to the Association.

21

Maxatawny also argues that its cross-claim "asserted that [Upper Macungie] should be responsible to [Maxatawny] for damages alleged in the instant action, based upon the language from the Commission's Charter." (Maxatawny's Br. at 5.) Maxatawny argues further that the trial court exercised sound discretion in concluding that "attorney[s'] fees were part of the damages reasonably contemplated by or available under the [Commission's] Charter." (Maxatawny's Br. at 6.)

Here, the trial court concluded that Upper Macungie was responsible for Maxatawny's and Topton's attorneys' fees because such attorneys' fees were incurred solely as a result of Upper Macungie's withdrawal from the Commission. The undisputed evidence at trial, however, establishes that the Commission dissolved and the Department disbanded upon the motion of Maxatawny, with a unanimous affirmative vote by the Participants. Pennsylvania consistently follows the American Rule, whereby "there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties, or some other established exception." *Herd Chiropractic Clinic, P.C. v. State Farm Mut. Auto. Ins. Co.*, 64 A.3d 1058, 1066 (Pa. 2013). Maxatawny and Topton have not cited, nor can we find, any provision in the Charter or the Amendment to the Charter that would entitle Maxatawny and Topton to recover from Upper Macungie the attorneys' fees that they incurred in connection with the dissolution of the Commission.

While we do not question the trial court's finding that the dissolution was precipitated by Upper Macungie's notice of its intent to withdraw unless the Commission changed its Charter, the record is clear that the withdrawal never occurred. Moreover, no one disputes that the Commission's Charter expressly allowed any participant to withdraw voluntarily from the Commission for any

22

reason. (R.R. at 318a.) The trial court's award of attorneys' fees essentially penalizes Upper Macungie for exercising that right of withdrawal. While there is no question that Upper Macungie used its position as the financially dominant member of the Commission to its advantage, there is nothing in the record that would support a conclusion that it acted inconsistent with the express terms of the Commission's Charter.[11]

For these reasons, we conclude that the trial court committed an error of law and abused its discretion by awarding attorneys' fees to Topton and Maxatawny on Maxatawny's cross-claim.[12]

## IV. CONCLUSION

For all of the above-stated reasons, we reverse the trial court's order.[13]

P. KEVIN BROBSON, Judge

---

[11] During oral argument, counsel for Maxatawny suggested that Maxatawny's cross-claim is based on a cause of action against Upper Macungie for violation of an implied duty of good faith and fair dealing. A review of the record and the briefs filed with this Court reveal that the cross-claim does not contain such a cause of action, and neither the parties nor the trial court analyze whether such an implied duty existed among the Participants in the Commission and, if so, whether Upper Macungie breached that implied duty through its conduct leading to the dissolution of the Commission.

[12] We also note that, while the trial court suggests that the other municipalities joined in Maxatawny's cross-claim (*see* Trial Ct. Op. at 6), we have found no evidence in the record to indicate that Topton either joined Maxatawny's cross-claim or filed its own cross-claim against Upper Macungie.

[13] Given our disposition above, we need not consider Upper Macungie's remaining issue on appeal—*i.e.*, whether the Commission was a necessary party to this action.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Berks-Lehigh Regional Police   :
Officers Association   :
  :
      v.   :   No. 1407 C.D. 2017
  :
Upper Macungie Township, Topton   :
Borough, Lyons Borough, and   :
Maxatawny Township   :
  :
  :
Appeal of: Upper Macungie Township   :

# **O R D E R**

AND NOW, this 17th day of October, 2018, the order of the Court of Common Pleas of Berks County is hereby REVERSED.

_____
P. KEVIN BROBSON, Judge